Filed 12/2/25  P. v. Pina CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051047 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1516073) |
| v. | |
| JESUS DAVID PINA, | |
| Defendant and Appellant. | |

Charged with murder after his codefendant shot and killed Jonathan Natareno, defendant Jesus David Pina pleaded no contest to voluntary manslaughter.  After the Legislature narrowed the scope of murder liability and established a mechanism for making these changes retroactive to otherwise final convictions, Pina petitioned the trial court for resentencing under Penal Code section 1172.6.[1]  After issuing an order to show cause on Pina's prima facie showing of entitlement to relief, the trial court held an evidentiary hearing in his absence, without ascertaining whether Pina was aware of his constitutional right to be present, and denied the petition.  Because the People have not shown that the constitutional error of proceeding in absentia was harmless beyond a reasonable doubt, we will reverse.  For guidance on remand, we will address Pina's

---

[1] Unspecified statutory references are to the Penal Code.

further contention that the trial court failed to apply the correct legal standard for aiding and abetting implied malice murder.

## I.  BACKGROUND

### A.  *Pina's Convictions*

The Santa Clara County District Attorney charged Pina and codefendant Anthony Escamilla with murder (§ 187; count 1), active participation in a criminal street gang (§ 186.22, subd. (a); count 2), and conspiracy to commit murder (§ 182, subd. (a)(1); count 3).  As to count 1, it was alleged that a principal in the offense personally and intentionally discharged a firearm (§ 12022.53, subds. (d) & (e)(1)), and to both counts 1 and 3, it was alleged that Pina and Escamilla committed the crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)).

In January 2018, Escamilla agreed to cooperate with the prosecution and pleaded guilty to first degree murder, admitting the gang enhancement and firearm enhancement, and conspiracy to commit murder.  In return, he was sentenced to an indeterminate term of 50 years to life.  That same month, Pina proceeded to trial.  The jury acquitted Pina of conspiracy to commit murder (count 3) and first degree murder (count 1) but could not reach a verdict on the lesser included offense of second degree murder or on the substantive gang offense (count 2).  The trial court declared a mistrial as to count 2 and the lesser included offense of second degree murder as to count 1.

In April 2018, the parties reached a settlement:  The Santa Clara County District Attorney filed an amended information adding count 4, voluntary manslaughter (§ 192, subd. (a)) with a gang enhancement under section 186.22, subdivision (b)(1)(C); Pina in turn pleaded no contest to the new manslaughter count and admitted the gang enhancement, for a stipulated sentence of 16 years in prison—six years for manslaughter and 10 years for the gang enhancement.  Counts 1 through 3 were dismissed.

2

**B.** *The Petition for Resentencing*

After Pina was convicted and sentenced, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.), amending sections 188 and 189 to eliminate imputed malice theories of murder (Stats. 2018, ch. 1015, §§ 2–3) to " ' "more equitably sentence offenders in accordance with their involvement in homicides." ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*).)  The new legislation gave retroactive effect to these amendments by permitting eligible defendants convicted of murder to petition the trial court for vacatur of their convictions and for resentencing.  (Stats. 2018, ch. 1015, § 4; former § 1170.95.)  Effective January 1, 2022, the Legislature expanded eligibility for resentencing to those who were convicted of manslaughter by plea.  (Stats. 2021, ch. 551, § 2; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388.)  In February 2022, Pina petitioned for resentencing under former section 1170.95 (now section 1172.6), alleging that he was eligible for resentencing.  After appointing counsel, the court in March 2023 found that Pina had stated a prima facie case for relief and ordered the People to show cause why Pina should not be resentenced.

The district attorney acknowledged that it was Escamilla who killed Natareno but maintained based on transcripts and exhibits from Pina's trial that Pina could have been convicted of either second degree implied malice murder or—despite the acquittal on the conspiracy charge—a conspiracy to commit murder.

1.    *The Evidentiary Hearing*

In May 2023, the trial court held an evidentiary hearing in Pina's absence.  At the beginning of the hearing, defense counsel informed the court that Pina was "currently housed at Fire Camp," was "aware that we're having this hearing," and "would have liked to have been able to phone in and listen to what's going on."  But defense counsel added, "[H]e understands that if that can't be made possible, he is fine with me appearing for him and representing his interests and his waiver of appearance at this hearing, [provided] that I follow up with him afterwards."  Defense counsel, however,

acknowledged: "CDCR did say that they could pull [Pina] from [his Fire Camp] duties if I gave them enough notice. And that notice is a little fluid depending on who I talk to. And clearly it didn't happen last week, but Mr. Pina is fine with my going forward on his behalf."

The prosecutor, referencing *People v. Basler* (2022) 80 Cal.App.5th 46 (*Basler*), pressed for clarification "that [defense counsel] did speak to Mr. Pina. That Mr. Pina understood the nature of the hearing, his right to be present, and he elected to waive that presence."

In response, defense counsel stated: "I'll just repeat that I've spoken to Mr. Pina throughout this entire process. . . . [¶] He understands fully what the hearing is. He understands fully what his participation would—probably would or would not be, and he is fine with waiving his appearance."

The trial court asked defense counsel if she was satisfied that Pina understood what "[defense counsel] was saying." Defense counsel said she was, and the prosecutor agreed this addressed his concerns.

The parties thereafter relied on evidence from Pina's trial and admitted no other evidence.

### 2.      *The Trial Transcripts*

#### a.      *The Prosecution's Case*

Escamilla testified that he became a member of Varrio Sureño Malditos (VSM), a Sureño criminal street gang, when he was 13 years old. VSM's main rivals are Norteños, including "other people that hang around . . . Pensacola [Drive]," or P Block. Pina was already a VSM member when Escamilla met him in 2011.

In the days before Natareno's murder, Pina told Escamilla that he and other VSM members had been shot at by some men near Pensacola Drive. On the day that Natareno was killed, Escamilla was riding in Pina's car when Pina alluded to money Escamilla owed another VSM member. Pina also told Escamilla that the " 'homies want to know

4

where [Escamilla] stand[s]' " and " 'want proof' " that Escamilla would live up to the " 'Malditos' " tattoo on his chest.

Pina pulled over and retrieved a .357-caliber firearm from under the hood of his car. Escamilla agreed to accompany Pina in " 'going to look for some people.' " Escamilla believed they were going to look for Norteños based on the gun and Pina's earlier reference to Escamilla proving his loyalty to the " 'homies.' "

Pina drove toward Pensacola Drive and the San Jose Apartments, and they saw a group of African-American men. Pina braked and identified the group as " 'the mother fuckers that shot at us.' " Pina pulled into a driveway, handed Escamilla his gun and said, " 'You know what to do.' " Escamilla believed he was expected to find the group that Pina had pointed out.

Escamilla walked over to the San Jose Apartments but saw no one in the apartment parking area. Walking back toward Pensacola Drive, Escamilla saw Natareno, whom he recognized as the younger brother of a high-ranking Sureño. Escamilla did not recall what he said to Natareno, though he recalled Natareno saying that " '[t]his is not your hood' " and that " 'it's all bad.' " Escamilla showed Natareno the gun and then shot Natareno five times. Escamilla was "not sure" why he shot Natareno but was afraid to return "empty-handed" and be considered a coward. Escamilla did not think Pina intended for him to kill Natareno, only that Pina wanted Escamilla to "prove [him]self."

On rejoining Pina, Escamilla reported that he had shot Natareno, to which Pina responded that Natareno was "the homie's little brother." Pina then drove Escamilla over to Pina's uncle's house.

Law enforcement identified Pina through the car—rented to Pina's girlfriend— that surveillance video showed the suspects using. Facebook records showed that Pina commented about having a ".357," keeping a gun in a car, and having been shot at several weeks before Natareno was killed. Forensic analysis suggested that a bullet retrieved from the scene and another from Natareno's stomach were either ".38[-caliber]

5

Special or .357[-caliber] Magnum" and that both bullets had been fired from the same gun.

Cell phone records showed that Pina's phone was near the homicide scene at the time that Natareno was killed and near the home of Pina's uncle shortly after.

According to a police officer testifying as a gang expert, the Sureños' main rivals are Norteños, including Pensacola Boys (P Block). The expert opined that Natareno's killing benefited VSM by sending a message that VSM was retaliating for past shootings. The expert also testified that a Sureño's failure to act on perceived disrespect to the gang could be perceived as cowardice.

### b. *The Defense*

Pina testified that he was a VSM member and that sometime before Natareno was killed, Pina and another gang member had been fired at several times by an African-American man. Although Pina later wrote on Facebook that he had a " 'green light on, no questions ask[ed]' " for any African-Americans, Pina testified that he meant only to warn others that "these guys are armed" and "willing to shoot": Pina lacked authority to issue a "green light to kill" someone.

The day that Natareno was killed, Escamilla was intoxicated and asked Pina to drive him to " 'Evil's house.' " Pina took Escamilla to the San Jose Apartments and left him there. Pina drove over to his uncle's house to pick up marijuana for a regular customer, and he heard gunshots when he returned to the area to complete the sale.

The next day, Pina saw a social media post reporting that Natareno had been killed. Pina asked Escamilla what happened, and Escamilla said that he had killed Natareno.

### 3. *The Arguments and the Court's Decision*

At the evidentiary hearing, the prosecutor argued that Pina, believing that a P Block member had shot at him, put a "green light on" P Block members and pressured Escamilla to prove loyalty to VSM with a gun Pina supplied. The prosecutor thus argued

6

that Pina either aided and abetted implied malice murder or conspired to commit murder.[2] Defense counsel urged the trial court to discount Escamilla's testimony as he had received a plea agreement in exchange for his cooperation. Defense counsel also argued that Escamilla's shooting of Natareno, the younger brother of a fellow Sureño, was at odds with the prosecution's gang theory.

The trial court concluded that Pina was not entitled to resentencing, finding sufficient evidence that he harbored implied malice necessary for a second degree murder conviction, and denied his petition.

Pina timely appealed.

## II.    DISCUSSION

### A.    *Right to Be Present*

The Attorney General concedes that "there does not appear to be sufficient evidence of a valid waiver" of Pina's right to be present but argues that Pina was not prejudiced by the constitutional error. We agree with the parties that the putative waiver was ineffective but cannot deem the error harmless beyond a reasonable doubt.

#### 1.    *Legal Principles and Standard of Review*

Once a trial court has issued an order to show cause why relief should not be granted to a petitioner who has stated a prima facie case for resentencing under section 1172.6, the matter proceeds to an evidentiary hearing where the parties may "offer new or additional evidence to meet their respective burdens." (§ 1172.6,

---

[2] The jury in Pina's first trial, however, found Pina not guilty of both first degree murder (in which one theory of murder was uncharged conspiracy to commit murder) and conspiracy to commit murder. In *People v. Cooper* (2022) 77 Cal.App.5th 393, the First District held that "a trial court cannot deny relief in a [section 1172.6] proceeding based on findings that are inconsistent with a previous acquittal when no evidence other than that introduced at trial is presented." (*Cooper*, at p. 398; but see *People v. Hart* (2025) 113 Cal.App.5th 1099, 1109 [issue preclusion applies to ultimate facts necessarily proven beyond a reasonable doubt in the later proceeding].)

subd. (d)(3).)  The evidentiary hearing is " 'akin to a plenary sentencing hearing' and thus a 'critical stage' in the criminal process even though it prevents imposition of a sentence greater than that originally imposed." (*Basler*, *supra*, 80 Cal.App.5th at p. 58; *People v. Quan* (2023) 96 Cal.App.5th 524, 533–534 (*Quan*).)  As a critical stage of the criminal proceeding, the evidentiary hearing is subject to " 'the [defendant's] constitutional right to be personally present in court "where necessary to protect the defendant's opportunity for effective cross-examination, or to allow him to participate at a critical stage and enhance the fairness of the proceeding." ' [Citations.]  The right is guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution, as well as article [I], section 15 of the California Constitution." (*Basler*, at p. 57 [citing U.S. Const., 6th & 14th Amends. and Cal. Const., art. I, § 15]; *Quan*, at p. 534 [despite lack of jury trial right in § 1172.6 evidentiary hearings, right to be present "significantly contributes to the fairness of the hearing as a matter of due process"].)

A defendant can waive this constitutional right to be personally present.  (*Basler*, *supra*, 80 Cal.App.5th at p. 57; *Quan*, *supra*, 96 Cal.App.5th at pp. 534–535.)  But the waiver must be "knowing, intelligent, and voluntary."  (*People v. Cunningham* (2015) 61 Cal.4th 609, 633.)  It remains "an unsettled . . . question whether a waiver by defense counsel is effective." (*People v. Mendoza* (2016) 62 Cal.4th 856, 899 (*Mendoza*).)  "At a minimum," however, "there must be some evidence that the defendant understood the right he was waiving and the consequences of doing so."  (*People v. Davis* (2005) 36 Cal.4th 510, 532 (*Davis*).)

Failing to procure a valid waiver of a defendant's right to be present for a critical proceeding is federal constitutional error that is reversible unless the prosecution proves beyond a reasonable doubt that the error was harmless.  (*Davis*, *supra*, 36 Cal.4th at p. 532 [following *Chapman v. California* (1967) 386 U.S. 18, 23 (*Chapman*)].)

8

## 2.   *Waiver*

The Attorney General appropriately concedes that there is scant evidence that Pina's putative waiver was knowing, intelligent, and voluntary.  Reviewing the issue de novo, we find the waiver insufficient.  (See *People v. Perry* (2006) 38 Cal.4th 302, 311 [de novo review applies to trial court's exclusion of defendant from trial].)

It is difficult to assess whether a defendant's waiver is knowing, intelligent, and voluntary when it is not the defendant who proffers it.  Typically, where a defendant's waiver has been deemed sufficient, it is the defendant himself who communicated the waiver.  (See *Davis*, *supra*, 36 Cal.4th at p. 532; see also *People v. Weaver* (2001) 26 Cal.4th 876, 966–967 [defendant waived right to be present on the record before the trial court]; *Cunningham*, *supra*, 61 Cal.4th at p. 631 [defendant personally waived presence at pretrial hearings]; *People v. Wall* (2017) 3 Cal.5th 1048, 1059 [defendant "personally and expressly waived right to be present"]; but see *Polizzi v. United States* (2d Cir. 1991) 926 F.2d 1311, 1322 ["Although it is certainly preferable that the waiver come from the defendant directly, there is no constitutional requirement to that effect"].)

Here, Pina did not waive his presence personally or even in writing, and even assuming a waiver through counsel could suffice, the trial court accepted representations by Pina's counsel that were inadequate on their face.  To be sure, defense counsel represented that she had spoken to Pina about the evidentiary hearing and that he "fully" understood the nature of the hearing.  And we have no reason to doubt counsel's veracity as an officer of the court.  Yet despite the prosecutor's reference to *Basler*, *supra*, 80 Cal.App.5th 46, defense counsel did not indicate whether she had advised Pina of his *right* to be present, and the trial court sought no confirmation that Pina understood the right he was waiving, as distinct from his understanding of the general nature of the hearing.[3]  "All the record shows is that defense counsel represented to the court that

---

[3] At the time of the evidentiary hearing, former section 977, subdivision (b)(2)(B) provided that defense counsel could waive a defendant's statutory right to be present

9

counsel had discussed the hearing with defendant and that defendant would waive his presence." (*Davis*, *supra*, 36 Cal.4th at p. 532; see *id*. at pp. 530, 531–532 [finding waiver ineffective when defense counsel represented that the defendant knew the purpose of the hearing "but had decided to 'waive his presence' "]; see also *Quan*, *supra*, 96 Cal.App.5th at p. 535 [no effective waiver when defense counsel represented that he had the authority " 'pursuant to [§ ]977[, subd. ](b)' " to proceed on defendant's behalf].)

The record at best invites the inference that Pina reluctantly acquiesced to CDCR determining whether his appearance—even telephonically—could be arranged: Defense counsel stated that Pina "would have liked to have been able to phone in" to the evidentiary hearing but that if this was not possible, Pina would permit defense counsel to proceed in his absence. These statements suggest not that Pina understood that he had a constitutional right to be present but that Pina believed that his attendance turned on the CDCR's willingness to facilitate his appearance. It is therefore unclear whether Pina "understood the right he was waiving." (*Davis*, *supra*, 36 Cal.4th at p. 532.) Nor is it apparent that Pina understood "the consequences of doing so"—that the court would rule before his counsel had informed him of the evidence and argument presented and without his having an opportunity to consult with counsel on her response to that evidence and argument. (*Ibid.*)

Absent evidence of a knowing, intelligent, and voluntary waiver of Pina's right to be present, the trial court effectively infringed that right by proceeding in his absence. (*Davis*, *supra*, 36 Cal.4th at p. 532.)

---

"after counsel has stated on the record that the defendant has been advised of the right to be physically or remotely present for the hearing at issue, has waived that right, and agrees that notice to the attorney that the defendant's physical or remote presence in court at a future date and time is required is notice to the defendant of that requirement." (Stats. 2022, ch. 57, § 12.)

### 3.    *Prejudice*

Under *Chapman*, *supra*, 386 U.S. 18, reversal is required unless the denial of Pina's right to be present was harmless beyond a reasonable doubt.  The Attorney General disputes the standard of review, quoting *People v. Blacksher* (2011) 52 Cal.4th 769 at page 799 for the proposition that it is Pina's burden to prove that " 'his absence prejudiced' " him.  But *Blacksher* involved only noncritical proceedings where the high court concluded that "defendant's presence was not necessary . . . to contribute to the fairness of the procedure." (*Ibid.*)  Because Blacksher's absence thus implicated no federal constitutional right, it did not apply the *Chapman* standard of harmless error. (*Ibid.*)[4]  And on this record, we cannot conclude beyond a reasonable doubt that Pina's absence did not affect the outcome of the resentencing proceeding.

The principal dispute at the evidentiary hearing was Pina's mens rea.  The parties do not dispute that Escamilla shot Natareno and that Pina was not the actual killer.  The prosecutor thus in part pursued a theory that Pina was liable for aiding and abetting a second degree implied malice murder, which remains a viable theory of murder under current law. (*Reyes*, *supra*, 14 Cal.5th at p. 990.)  And to be liable as a direct aider and abettor to implied malice murder, " 'the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is

---

[4] Furthermore, our high court has characterized the *Chapman* standard as placing the burden to demonstrate harmlessness on the *beneficiary* of the error—in this case, the People.  (See *People v. Jackson* (2014) 58 Cal.4th 724, 748.)  And in *Chapman* itself, the United States Supreme Court likewise placed the burden on the beneficiary of the alleged error to demonstrate harmlessness, stating:  "Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless.  It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." (*Chapman*, *supra*, 386 U.S. 18, 24.)

11

knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes*, at p. 991.) Indeed, the trial court agreed with the prosecutor, finding at the conclusion of the evidentiary hearing that "a reasonable conclusion could be, or an implication could be made that he did harbor malice necessary for [second degree murder]."

Because Pina's eligibility for resentencing rested on whether he possessed the mens rea of implied malice, we cannot find beyond a reasonable doubt that his absence at the evidentiary hearing was harmless. Pina testified at trial, denying any knowledge that Escamilla intended to shoot anyone—in fact, his trial testimony was that he simply dropped Escamilla off at the driveway near the apartments where Natareno was fatally shot. At the evidentiary hearing, Pina was "entitled to hear the People's evidence and argument on the point, then decide whether to testify and/or present additional or new mitigating evidence on his behalf." (*Basler*, *supra*, 80 Cal.App.5th at p. 60; *Quan*, *supra*, 96 Cal.App.5th at p. 536.) Given the prosecution's arguments in opposition to his petition, Pina could have elected to testify further at the evidentiary hearing about his actions that day, his Facebook posts, or his relationship with Escamilla—including what, if anything, Pina "knew of his confederat[e's] willingness to kill." (*Quan*, at p. 537.) The trial court would of course have been free to disbelieve Pina based on contrary trial evidence, including any material omissions from Pina's own prior testimony. And even without further testimony, Pina "may have given input to his counsel on the People's presentation and arguments, resulting in his counsel drawing different inferences from the trial evidence or doing more than submitting on the papers." (*Basler*, at p. 60.) We accordingly cannot on this record conclude beyond a reasonable doubt that his absence was harmless. (See *id*. at pp. 59–60; *Quan*, at pp. 536–537; see also *People v. Simms* (2018) 23 Cal.App.5th 987, 998 [defendant's absence at hearing on Prop. 47 (Nov. 4,

12

2014) petition for recall of resentence prejudicial because eligibility turned on disputed issues of fact].)

The Attorney General argues that any error was harmless because unlike certain cases—like *Basler*—defense counsel represented that she had spoken with Pina about the purpose of the hearing and had further stated that Pina "underst[ood] fully what his participation would—*probably* would or would not be." (Italics added.) (See *Basler*, *supra*, 80 Cal.App.5th at p. 60 [no evidence that defense counsel had discussed hearing with the defendant].) But it is unclear whether Pina's consultation with his counsel sufficiently conveyed to him the substantive detail of the prosecution's arguments against resentencing, his own potential role in the resentencing proceeding, and his ability to present additional evidence.[5]

On this record, we cannot find proceeding in Pina's absence to be harmless beyond a reasonable doubt.

## B. *Implied Malice*

Pina alternatively argues that reversal is required because the California Supreme Court after his evidentiary hearing clarified the elements of implied malice murder. (See *Reyes*, *supra*, 14 Cal.5th 981; *People v. Collins* (2025) 17 Cal.5th 293 (*Collins*).)

Aiding and abetting implied malice murder remains a valid theory of murder liability. (*Reyes*, *supra*, 14 Cal.5th at p. 990.) But the *Reyes* court explained that under this theory of accomplice liability, the prosecution must show that an alleged accomplice did more than "merely create a dangerous situation in which death is possible depending

---

[5] The Attorney General argues that Pina's absence was harmless in that, as in *Davis*, "we do not know what defendant would have said" about certain evidentiary disputes. (*Davis*, *supra*, 36 Cal.4th at p. 533.) But the hearing at issue in *Davis* is distinguishable as a pretrial hearing only on the admissibility of recorded jailhouse conversations. Moreover, the trial court's rulings at the hearing "were without prejudice to later arguments that the transcript [of the recording] was inaccurate or that certain portions were not admissible." (*Ibid.*)

on how circumstances unfold": The accomplice's acts must have aided the direct perpetrator's commission of an act that " ' "involve[] a high degree of probability that it will result in death" ' " and " 'proximately causes death.' " (*Id.* at pp. 989, 991.) "To suffice for implied malice murder, the [direct perpetrator's] act[s] must not merely be dangerous to life in some vague or speculative sense." (*Id.* at p. 989.) For example, certain acts preceding the life-threatening act—such as "travel[] to rival gang territory" while armed—is insufficient. (*Id.* at p. 991.) And beyond the bare act of aiding the commission of the life-endangering act, direct accomplice liability "requires attention to the aider and abettor's mental state concerning the life endangering act committed by the direct perpetrator, such as shooting at the victim." (*Id.* at p. 992.) "[T]he trial court should . . . ask[] whether [the defendant] knew that [the direct perpetrator] intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Ibid.*)

We decline Pina's invitation to conclude that the trial court erred in its application of these elements, given that the trial court on remand will conduct a new evidentiary hearing with Pina's participation. We note, however, that the record leaves unclear what actions the court determined were the basis of the aiding and abetting: The court appears to have applied a but-for causation standard, concluding, "[T]his murder would never have occurred without Mr. Pina's actions. So I believe that he's not entitled to resentencing." Nor is it clear whether the court credited Escamilla's testimony that Pina supplied the gun and pressured Escamilla to prove himself by using it.[6]

---

[6] At the resentencing hearing, the trial court observed that "a reasonable conclusion could be, or an implication could be made" that Pina acted with implied malice. We reiterate that the burden is on the prosecution to prove a defendant's guilt under a valid murder theory beyond a reasonable doubt. (§ 1172.6, subd. (d)(3); see also Stats. 2021, ch. 551, § 1(c) ["[r]eaffirm[ing] that the proper burden of proof at a resentencing hearing under [precursor to § 1172.6] is proof beyond a reasonable doubt"].)

14

Also on remand, the trial court will have an opportunity to consider Pina's further claim that *People v. Pittman* (2023) 96 Cal.App.5th 400, decided after the evidentiary hearing, makes his youth more relevant to the determination of implied malice. We express no opinion on that issue.

### III. DISPOSITION

The order denying Pina's petition for resentencing is reversed and the matter is remanded for a new evidentiary hearing under Penal Code section 1172.6 at which Pina shall be present unless he provides a knowing, intelligent, and voluntary waiver of his right to be present.

_____

LIE, J.

WE CONCUR:

_____

GROVER, Acting P. J.

_____

KULKARNI, J.*

*People v. Pina*
H051047

---

*Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.